02-12-060-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00060-CV


 
 
 Glencrest Resources, LLC and Leonard Edward Briscoe,
 Jr., Doris Briscoe, and Rosanna Briscoe, as Heirs to the Estate of Leonard
 Briscoe, Sr.
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
 
 
 
 
 Pamela Ellis, Individually and on Behalf of All
 Others Similarly Situated
 
 
  
 
 
 APPELLEE
 
 


 

----------

FROM THE 348th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

In
this interlocutory appeal,[2] appellant Glencrest
Resources, LLC complains that the trial court erred by certifying this case as
a class action.  Appellants Leonard Edward Briscoe Jr., Doris Briscoe, and
Rosanna Briscoe, as heirs to the estate of Leonard Briscoe Sr. (collectively,
the Briscoe defendants) complain that the trial court erred by failing to
dismiss them from the suit.  We overrule the Briscoe defendants’ issue, and we
vacate the trial court’s class certification order and remand the case to the
trial court for further proceedings.

Background
Facts

In
2005 and 2006, oil and gas companies were vigorously pursuing oil and gas
leases for land in the Barnett Shale region of Forth Worth.  Some residents
felt that they lacked the knowledge and bargaining power necessary to obtain
desirable lease terms.  At the request of the Glencrest Neighborhood
Association, Glencrest Resources, LLC (Glencrest) was created to “represent the
neighborhood association in trying to put together a lease package or an
overall lease deal for the entire neighborhood.”  Briscoe Sr. was the manager
of Glencrest, and his son, Briscoe Jr., helped his father run the organization.

Once
formed, Glencrest put up flyers in the neighborhood regarding informational
meetings and stating that Glencrest was offering a $3,000 bonus payment per
acre with a $750 minimum bonus payment for land less than one acre.  The flyers
advertised that this was the “[b]est financial offer in the market” and the “[b]est
protection against fraud and abuse.”

Briscoe
Jr. estimated that there were about a hundred neighborhood meetings. 
Landowners listened to the presentation, asked questions, and then moved to the
back of the meeting space to sign the leases.  Roughly 3,100 landowners signed
leases at the meetings.  No title checks were performed at the time of the
signings.  The leases themselves do not make reference to the bonus payment. 
None of the flyers or any other written communication to the landowners set out
the bonus payment agreement other than the amount of bonus per acre.

Pam
Ellis attended a meeting on December 5, 2006.  Ellis testified that Briscoe Sr.
told the landowners “something about the ones that signed on, their property
had to be surveyed for the size of the property so they would know the amount
of bonus to pay and that that would take several weeks.”  She testified that her
understanding from Briscoe Sr.’s speech was that she would be paid her bonus
“within several weeks.”  She testified that people asked Briscoe Sr. when they
would get their money and his response was, “We need time to survey your
property according to the size to know how much bonus to pay."  She also
testified that there were no documents that said in what time period the
bonuses would be paid.  After the meeting, she signed the lease with
Glencrest.  When she was not paid after about six weeks, Ellis called Briscoe Sr. 
He told her that “the check was in the mail.”

It
is undisputed that at the time of the meetings, Glencrest did not have the
money to pay the bonuses.  David Drumm, an attorney at Carrington Coleman, the
firm that represented Glencrest during this period, testified, “We knew we couldn’t
pay the bonuses then, and made it clear, to my understanding, to the people we
couldn’t pay it right then.”  Glencrest expected to have the money soon, but
ended up not having the financial ability to pay bonuses until May 2008.

In
May 2008, Glencrest sent letters to landowners and made phone calls letting the
landowners know that their bonus payments were available.[3]  On weekdays, Glencrest
operated an office where people could get their bonus payments, and on
Saturdays, the company worked out of a church.  When they arrived, landowners
had two options: they could ratify their original three-year lease and get a
$3,000 per acre bonus, or they could amend their lease for a longer five-year primary
term and get a $6,500 per acre bonus.  Briscoe Jr. explained,

We
told individuals that if they had a three-year lease, that would be what was
called just a reinstatement and then a ratification.  But then the main focus
of the conversation was to explain the best offer, which was the one that had
the most money, which was the $6,500 per acre lease.  In those conversations,
I’ve only had three people that I can recall that wanted the $3,000 per acre
bonus.  We paid it to them.  And they then ratified and reinstated their
three-year lease.

Roughly
1,000 to 1,300 of the initial lessors signed a ratification and amendment to a
five-year primary term with the higher bonus.  Drumm testified that “not more
than” twenty-five people opted not to extend their lease to the five-year term
and took the original bonus offer.  Briscoe Jr. testified that he only knew of
three people who chose to take the smaller bonus.  Another approximately 1,307
of those original lessors either had top leases[4]
or competing leases, which prevented them from ratifying and prevented
Glencrest from paying the bonus.  A few people refused to take their bonus
altogether.  One man filed a lawsuit against Glencrest.  Another demanded to be
released from the lease, which Briscoe Jr. granted.  The Glencrest office was
open until roughly April 2009.

On
October 30, 2007, Ellis filed this suit.  She alleged that “Briscoe[] Sr.
represented that if Plaintiff and the other homeowners who attended the meeting
signed the proposed oil, gas, and mineral lease that evening, they would get
their bonus payment within 30 to 45 days.”  She sued for fraudulent inducement
and breach of contract.  Ellis later filed a motion for class certification,
seeking to certify the class as “Any person who, from January 1, 2006 through
April 30, 2008, entered into an oil, gas, and mineral lease with Defendant
Glencrest . . . , and has not received a bonus payment.”  Ellis estimated that
about 1,000 of the lessees would be members of the class.

Glencrest
responded to the motion for class certification by arguing that the contracts
were executed at different times and under different circumstances, and that
individual issues predominate over common issues.  It identified various
individual issues to include “whether title problems existed that prevented
performance, whether a particular plaintiff engaged in action that prevented
performance, whether Defendants offered performance, whether a particular
Plaintiff had signed with more than one contractor, [or] whether a particular
Plaintiff was offered performance but refused because they changed their mind . .
. .”  It argued that “plantiffs’ vague allegations in their petition of a
‘common course of conduct’ do not relieve the plaintiffs of their burden to
demonstrate that common issues predominate.”

Ellis
filed special exceptions to Glencrest’s response, which the trial court
granted.  Ellis also filed a motion for sanctions for alleged discovery abuses
committed by Glencrest, which was denied.  Glencrest filed an amended
response.

The
trial court granted class certification, defining the class as “Any person who,
from January 1, 2006 through April 30, 2008, entered into an oil, gas, and
mineral lease with Defendant Glencrest . . . , and has not received a bonus
payment” excluding “individuals that during the effective date of the primary
term signed top leases or competing leases with third-party
companies/individuals” and “individuals that were actually paid the $3000 bonus
for the three-year primary term lease or had title issues that would have prevented
them from actually conveying what was part of the oil, gas, and mineral lease”
and “individuals who signed an amendment ratification for a five-year primary
term with a different bonus sometime after they signed the original three-year
primary term lease.”  The elements of the class claim were listed as

1. Was there an offer
by [Glencrest] to pay landowners a bonus payment of $3,000.00 per acre, with a
minimum of $750.00, in exchange for consideration of execution of an Oil,
Gas[,] and Mineral Lease in favor of [Glencrest]?

 

2. Did the landowner
accept this offer?

 

3. Did [Glencrest]
receive the consideration of an executed Oil, Gas[,] and Mineral Lease called
for in the offer?

 

4.  Did [Glencrest]
breach the contract by not paying the promised bonus payment? and 

 

5. Did the landowner
suffer damages as a result of this breach?

At
the class certification hearing, Ellis reurged her motion for sanctions and filed
her second motion for sanctions, arguing that Glencrest flaunted and disobeyed
discovery deadlines and withheld responsive documents.  The trial court granted
Ellis’s motions for sanctions, striking “any defenses to class certification
raised by pleadings filed after June 10, 2011 or evidence tendered after June
17, 2011.”  Glencrest and the Briscoe defendants then filed this appeal.

Class
Actions

Class
action certification in Texas is governed by Texas Rule of Civil Procedure 42.[5]
See Tex. R. Civ. P. 42.  At the certification stage, the plaintiffs have
the burden of establishing their right to maintain an action as a class action.
Life Ins. Co. of Sw. v. Brister, 722 S.W.2d 764, 770 (Tex. App.—Fort
Worth 1986, no writ), overruled on other grounds by Bernal, 22 S.W.3d
at 435.  In order to have a class action certified under Rule 42, it is
necessary for a claimant to satisfy all the requirements of Rule 42(a) and at
least one provision of Rule 42(b).  Subsection (a) requires that

(1) the class is so
numerous that joinder of all members is impracticable,

 

(2) there are
questions of law or fact common to the class,

 

(3) the claims or
defenses of the representative parties are typical of the claims or defenses of
the class, and

 

(4) the
representative parties will fairly and adequately protect the interests of the
class.

Tex.
R. Civ. P. 42(a).  Ellis sought certification under the third provision of
subsection (b), which states that “the questions of law or fact common to the
members of the class predominate over any questions affecting only individual
members, and a class action is superior to other available methods for the fair
and efficient adjudication of the controversy.”  Tex. R. Civ. P. 42(b)(3).  The
non-exhaustive factors the trial court should consider in this determination
are: (A) the interest of members of the class in individually controlling the
prosecution or defense of separate actions; (B) the extent and nature of any
litigation concerning the controversy already commenced by or against members
of the class; (C) the desirability or undesirability of concentrating the
litigation of the claims in the particular forum; and (D) the difficulties
likely to be encountered in the management of a class action.  Tex. R. Civ. P. 42(b)(3)(A)–(D).

Standard
of Review

The
appellate review standard for a class certification order is a modified abuse
of discretion.  Bernal, 22 S.W.3d at 439.  To determine whether a trial
court abused its discretion, we must decide whether the trial court acted
without reference to any guiding rules or principles; in other words, we must
decide whether the act was arbitrary or unreasonable.  Low v. Henry, 221
S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings, 134 S.W.3d 835, 838–39
(Tex. 2004).  An appellate court cannot conclude that a trial court abused its
discretion merely because the appellate court would have ruled differently in
the same circumstances.  E.I. du Pont de Nemours & Co. v. Robinson,
923 S.W.2d 549, 558 (Tex. 1995); see also Low, 221 S.W.3d at 620.  An
abuse of discretion does not occur when the trial court bases its decisions on
conflicting evidence and some evidence of substantive and probative character
supports its decision.  Unifund CCR Partners v. Villa, 299 S.W.3d 92, 97
(Tex. 2009); Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002).

As
the supreme court has explained,

In
Bernal, we expressly stated that the trial court’s decision to certify a
class was to be reviewed for an abuse of discretion, but we likewise expressly
refused to indulge every presumption in favor of the trial court’s ruling.  A
trial court has discretion to rule on class certification issues, and some of
its determinations—like those based on its assessment of the credibility of
witnesses, for example—must be given the benefit of the doubt.  But the trial
court’s exercise of discretion cannot be supported by every presumption that
can be made in its favor.  As we said in Bernal, “actual, not presumed,
conformance with [the rule] remains . . . indispensable.”  Compliance with Rule 42
must be demonstrated; it cannot merely be presumed.

 Henry
Schein, Inc. v. Stromboe, 102 S.W.3d 675, 691 (Tex. 2002).

Discussion

In
its second issue, Glencrest argues that the trial court abused its discretion by
certifying the class because Ellis failed to demonstrate that issues common to
the class predominate over individual issues.  Because the predominance requirement
of Rule 42(b)(3) is one of the most stringent prerequisites to class-action
certification, we consider first whether it was rigorously applied in the trial
court.  See Bernal, 22 S.W.3d at 434–35; see also Amchem Prods., Inc.
v. Windsor, 521 U.S. 591, 622, 117 S. Ct. 2231, 2249 (1997).  The
predominance requirement prevents class certification when complex and diverse
individual issues would overwhelm or confuse a jury or severely compromise a
party’s ability to present otherwise viable claims or defenses.  Henry
Schein, 102 S.W.3d at 690; Bernal, 22 S.W.3d at 434.  Certification
is not appropriate unless it is determinable from the outset that the
individual issues can be considered in a manageable, time-efficient and fair
manner.  Henry Schein, 102 S.W.3d at 688 (citing Bernal,
22 S.W.3d at 435).  “The test for predominance is not whether common issues
outnumber uncommon issues but . . . whether common or individual issues will be
the object of most of the efforts of the litigants and the court.”  Bernal,
22 S.W.3d at 434 (quoting Central Power & Light Co. v. City of San Juan,
962 S.W.2d 602, 610 (Tex. App.—Corpus Christi 1998, pet. dism’d w.o.j.)).  To
evaluate predominance, we identify the substantive issues that will control the
litigation, assess which issues will predominate, and determine if the
predominating issues are, in fact, those common to the class.  Id.

In
performing our analysis, we bear in mind that it is the plaintiff’s burden to
establish compliance with all prerequisites to certification.  See Methodist
Hosps. of Dallas v. Tall, 972 S.W.2d 894, 897 (Tex. App.—Corpus Christi
1998, no pet.); Brister, 722 S.W.2d at 770.  That is, the plaintiff must
offer evidence demonstrating compliance with each requirement.  But she is not
required to “make an extensive evidentiary showing.”  Tall, 972 S.W.2d
at 897.

1.  What
are the substantive issues?

This
is a breach of contract case;[6] thus, those issues
bearing on the elements of the purported class’s claim will be the substantive
issues.  The elements of written and oral contracts are the same and must be
present for a contract to be binding. Wal-Mart Stores, Inc. v. Lopez, 93
S.W.3d 548, 555–56 (Tex. App.—Houston [14th Dist.] 2002, no pet.).  The
following elements are required for the formation of a binding contract: (1) an
offer, (2) acceptance in strict compliance with the terms of the offer, (3) a
meeting of the minds, (4) each party’s consent to the terms, and (5) execution
and delivery of the contract with the intent that it be mutual and binding.  Id.

Ellis
argues that one of the terms of the offer was that payment would be performed
in a certain amount of time.  Although she underplays the importance of this
term of the offer, she does not dispute that Glencrest began offering payments
to lessors whom it was able to contact in May 2008,[7]
that an offer of payment was sent to her via her attorney, and that Glencrest
actually paid roughly 1,300 lessors.  Thus, in order for there to have been a
breach of the contract as Ellis contends, it must have been that Glencrest did
not offer payment to Ellis and the other class members in the time agreed by
the parties to the contract.[8]

Glencrest’s
complaint that the trial court struck its evidence of defenses as to the class
certification does not prohibit it from presenting those defenses at trial.[9] 
See Bernal, 22 S.W.3d at 435 (“[I]t is improper to certify a class
without knowing how the claims can and will likely be tried.”).  Thus, we must
consider those defenses in determining whether they will be substantial issues
in the case.  See Gene & Gene LLC v. BioPay LLC, 541 F.3d
318, 327 (5th Cir. 2008) (“An affirmative defense is not per se
irrelevant to the predominance inquiry.”).  One of Glencrest’s defenses is that
for some purported class members, there was some fault or act on the lessor’s
behalf that prevented Glencrest from completing payment.  For instance, it
argues that there may be issues with the landowner’s ability to demonstrate
good title, that the landowner could not be contacted, or that the landowner
refused payment or repudiated the contract.  Glencrest also argues that the
flyers advertising the meetings and the presentation made at the meetings were
not offers which landowners could accept by signing the lease but rather signing
the lease was an offer by the landowners which Glencrest could accept by paying
the bonus.

2.  Which
of the substantive issues will predominate?

It
is undisputed that the only documents discussing any of the terms of the bonus
payment were the flyers posted in the neighborhood advertising a $3,000 bonus
payment per acre with a $750 minimum bonus payment for land less than one acre.[10]  The amount of
the bonus is therefore not a predominate issue.  Neither does Glencrest contest
that it owes a bonus to everyone who signed a lease and qualifies for payment. 
See Hancock v. Chicago Title Ins. Co., 263 F.R.D. 383, 389–90 (N.D.
Tex. 2009) (acknowledging that because it was undisupted that “when the facts
show that a refund is warranted, Chicago Title must give the refund,” that
issue was not the question that would predominate at trial), aff’d sub nom.
Benavides v. Chicago Title Ins. Co., 636 F.3d 699 (5th Cir. 2011).

What
will predominate are the issues that are disputed by the parties.  The trial
court found that “[t]he issue that will be the object of most of the efforts of
the litigants and the court will be the determination of the breach of contract
claims.”  That includes what the precise terms of the oral contract were
(importantly, the terms regarding the timing of paying the bonuses and what
acts constituted the offer and the acceptance),[11]
whether particular landowners qualified for payment but were denied it, and any
defenses Glencrest presents regarding reasons for nonpayment.  These are the
issues that will entail much evidence and testimony, and it is these questions
that will be the object of much of the efforts of the litigants and the court.  See
Bernal, 22 S.W.3d at 434.

3.  Are
the predominate issues common to the class?

The class
certification order states, “Whether the offer was made by [Glencrest]
uniformly to all class members; the class members’ acceptance by signing
identical leases as called for in the offer as consideration; consideration;
and the alleged lack of payment are common to all of the class members.”  When
a class action is based on an oral contract, the terms of the oral contract
must be proven to be substantially similar by proving that the defendant
engaged in a “common course of conduct.”  See Nissan Motor Co. v. Fry,
27 S.W.3d 573, 588 (Tex. App.—Corpus Christi 2000, pet. denied) (“The
commonality requirement is generally considered satisfied where (1) many
members of the class are subject to the same misrepresentation or omissions by
reason of common documents, or (2) the defendant is alleged to have engaged in
a common course of conduct.”); Adams v. Reagan, 791 S.W.2d 284, 289
(Tex. App.—Fort Worth 1990, no writ).  “[C]lass-wide proof is possible when
class-wide evidence exists.”  Henry Schein, 102 S.W.3d at 693–94. 
However,

[i]nescapably
individual differences cannot be concealed in a throng.  The procedural device
of a class action eliminates the necessity of adducing the same evidence over
and over again in a multitude of individual actions; it does not lessen the
quality of evidence required in an individual action or relax substantive
burdens of proof.

Id. 
Thus, the purported class must demonstrate the common course of conduct
to meet its burden; it is not enough to merely allege it.  See Snyder
Commc’ns, L.P. v. Magaña, 142 S.W.3d 295, 301 (Tex. 2004) (“The
plaintiffs’ vague allegation in their petition of a ‘common course of conduct’
and Magaña’s brief testimony that an unidentified Snyder officer told her there
was a commission problem ‘in the whole company’ do not relieve the plaintiffs
of their burden to demonstrate that common issues predominate.”); see also
Hancock, 263 F.R.D. at 388 (“A class plaintiff cannot merely point to a ‘common
course of conduct’ without also demonstrating ‘whether the common course of conduct
provide[s] a class-wide basis for deciding the predominant class issues of fact
and law.’”) (quoting Gene & Gene, 541 F.3d at 326); Bernal,
22 S.W.3d at 435 (“Given the plaintiffs’ burden, a court cannot rely on mere
assurances of counsel that any problems with predominance or superiority can be
overcome.”) (quoting Castano v. American Tobacco Co., 84 F.3d 734, 744
(5th Cir. 1996)).  Demonstrating predominance in a case involving oral
representations is a very difficult task, and many courts have refused to
certify a class when oral statements have not been proven to be uniform.  See
Retired Chicago Police Assoc. v. City of Chicago, 7 F.3d 584, 597 (7th Cir.
1993) (holding that putative class failed to demonstrate a common course of
conduct when they did not show that the alleged communications were identical
or “uniformly made at every seminar”); Grainger v. State Sec. Life Ins. Co.,
547 F.2d 303, 307–08 (5th Cir. 1977) cert. denied, 436 U.S. 932, 98 S.
Ct. 2832 (1978) (noting that “the district court may quite properly refuse to
certify a class on the grounds that common questions of law or fact do not
predominate” when a plaintiff cannot demonstrate that oral statements were
“uniform, e.g., through use of a standardized sales pitch by all the company’s
salesmen”); Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
482 F.2d 880, 883 (5th Cir. 1973) (holding that a class action could not be
sustained because the plaintiff “fail[ed] to prove any standardized
representations” by the defendant); Cannon, 86 S.W.3d at 809 (“What each
class member in this case was told regarding monies owed under the advance
agreements . . . would require individual determination.”); Spector v.
Norwegian Cruise Line Ltd., No. 01-02-00017-CV, 2004 WL 637894, at *7 (Tex.
App.—Houston [1st Dist.] Mar. 30, 2004, no pet.) (upholding trial court’s order
denying certification when the breach of contract claim “could require
individual inquiries to the extent that oral representations might have formed
some or all of a class member’s contract”); Stobaugh v. Norwegian Cruise
Line Ltd., 105 S.W.3d 302, 307 (Tex. App.—Houston [14th Dist.] 2003, no
pet.) (holding that the putative class did not establish predominance when the
class members could not point to “evidence in the record showing that these
alleged oral misrepresentations were the same or similar among the proposed
class members”); Ways v. Imation Enters. Corp., 214 W. Va. 305, 314 (2003)
(“Because the bulk of the appellants’ breach of contract claims rests upon
alleged individual oral representations made by various members of management, .
. . individualized evidence as to the specific circumstances surrounding the
alleged promises is required.”).

Ellis
claims that the fact that the written leases are identical “evidenc[es] that
the landowners accepted the same offer.”  However, as we noted above, and as
explained by Ellis’s own expert,[12] the purported class’s cause
of action is not for a breach of the lease, and some terms of the bonus payment
offer were only communicated orally.  Drumm testified that there were hundreds
of group meetings and “maybe a few” one-on-one meetings in which the terms of
the lease and the bonus payment were discussed with landowners.  Ellis went to only
one of those meetings.  She testified that she did not know anyone at that
meeting and has made no attempt to contact anyone who attended the meetings.  Ellis
was the only witness testifying on behalf of the purported class who attended
the meetings.  Glencrest offered the testimony of Lias Young, another landowner,
who attended “at least two or three” of the meetings.  Young testified that at
the meetings he attended, he was never told a time period in which the bonus
would be paid.  Briscoe Jr. testified that he and Briscoe Sr. explained to the
landowners at the meetings that Glencrest did not have the money to pay the
bonuses at the time the leases were signed.  He said,

Sure, we told—I told
them that. I've got a real estate license. I better have told them.

 

Q.  Why do you say
you better have told them?

 

A.
 Because as a real estate license holder, I come up under certain rules and
requirements.  One of those are, if I, through my acts and statements, cause
someone to take an action concerning their property and they lose—lose money,
per se [sic]—then I could lose my license. I also could be sued, held
for misrepresentation, fraud, could be criminal.

Drumm,
who did not attend the informational meetings with the landowners, testified
that Glencrest’s “communication plan” was,

“that everybody in
the community would understand that this is the way to get a fair shake for the
community and that the bonus would have to be delayed until we could find a
funding source for the bonus.  But it would result in a higher bonus than if
they went out and just took what was available on the market at the time.”

He
admitted that he did not know whether the plan was communicated correctly, but
his understanding is that Glencrest “made it clear. . . to the people [that] we
couldn’t pay it right then.”

Sherman
testified, “[I]t’s not relevant that it was not contained in the lease if there
is adequate evidence—and it appears to be there clearly is in this case—that
there was an oral understanding made at these six or so meetings in churches,
of which there’s ample evidence of everyone saying that's exactly what the deal
was.”  It is unclear what evidence Sherman is referring to when he speaks of
the “ample evidence” of the statements made at the meetings.[13] 
If Ellis had such evidence, she did not present it at the hearing.  The evidence
of what was said at the meeting was Ellis’s testimony that she would be paid in
several weeks, Briscoe Jr.’s testimony that he notified the landowners before
they signed the leases that Glencrest did not have the funding to pay the
bonuses at that time, Drumm’s testimony that the plan was that they would
convey to the lessors that payment would have to wait until funds were found,
and Young’s testimony that he was not told at the meetings he attended when the
bonuses would be paid.  This is hardly ample evidence of any consistent
agreement.[14]  Sherman’s contention
that “[t]he fact that the leases were signed at different places, times, and
circumstances has nothing to do with” establishing a class cannot be true when
essential terms of the agreement were only made orally on numerous occasions to
different groups of people.

To
determine whether the terms of the agreement were uniformly presented to the
putative class or whether Glencrest engaged in a common course of conduct, it
may not be necessary to present testimony from every class member.  However, it
is most certainly necessary to present evidence that at least more than one
person understood that the terms were what Ellis alleges they were.  Here,
there is simply no evidence than anyone other than Ellis believed the bonus
payments were due within thirty or forty-five days of signing the lease.  To
put it another way, the trial court’s finding that “[w]hether the offer was
made by [Glencrest] uniformly to all class members . . . [is an issue] common
to all of the class members” is not supported by any evidence that if that
question were asked of all the class members, their answers would be the same. 
“Merely asking the same questions across a spectrum of thousands of potential
plaintiffs does not satisfy the strictures of” the class certification rule.  Hancock,
263 F.R.D. at 388.  “For a question to be a common substantive issue that
predominates, it must be definitely answered for all class members using a
generalized set of facts and producing one unified conclusion.”  Id. at
390.

Simply
pointing to common issues does nothing to address the predominance issue.  In
this case, Ellis has pointed to a “common course of conduct” without
demonstrating a common course of conduct that actually provides a classwide
basis for deciding the predominant issues of fact and law.  Each class member’s
understanding of when the bonus would be paid, which must be based on the
presentation at the neighborhood meetings, is inescapably a predominate issue. 
Yet Ellis’s testimony establishes only her understanding and no one else’s.  She
did not meet her burden to bring classwide proof to decide the predominance
issue.  Because Ellis has presented no classwide proof from which the
factfinder could ultimately determine whether Glencrest breached an oral
agreement to pay the bonus within a specific timeframe, Ellis has not shown
that the predominance requirement is satisfied.  Because predominance has not
been established, the trial court abused its discretion by certifying the
class.  We sustain Glencrest’s second issue.  Because we sustain Glencrest’s
second issue, we do not reach its other issues, which address other grounds for
decertifying the class.  See Tex. R. App. P. 47.1.

The
Briscoe defendants

In
their issue on appeal, the Briscoe defendants argue that the trial court abused
its discretion by failing to dismiss them from the suit, and they ask that this
court reverse the trial court’s order against them.  They also argue in this
same issue that Ellis has not provided legally sufficient evidence to prove
that they are liable in their personal capacity.  However, the Briscoe
defendants have not directed us to a finding or ruling by the trial court to
review, either for an abuse of discretion or for legal sufficiency, nor have we
found one.

Rule
33.1 of the Texas Rules of Appellate Procedure requires that the record must
show that: (1) the complaint was made to the trial court by a timely request,
objection, or motion that stated the grounds for the ruling that the complaining
party sought from the trial court, if the specific grounds were not apparent
from the context; and (2) the trial court ruled on the request, objection, or
motion, either explicitly or implicitly, or refused to rule on the request,
objection, or motion, and the complaining party objected to the refusal.  Tex.
R. App. P. 33.1(a).  A complaint regarding the legal insufficiency of the
evidence may be made for the first time on appeal.  See Tex. R. App. P.
33.1(d).

We
assume the Briscoe defendants are appealing from the order granting Ellis’s
motion and supplemental motion for class certification because that is the only
order they appended to their appellate brief.  However, there are no findings
or rulings by the trial court regarding the dismissal of the Briscoe defendants
in that order.  Further, the Briscoe defendants did not challenge the motions
for class certification on the ground they now raise on appeal.  In fact, the
only instance we found in the record in which the Briscoe defendants raised the
issue of dismissal at all was in their First Amended and Supplemental Answer
with Affirmative Defenses.[15]

There
is no ruling by the trial court regarding the Briscoes’ dismissal from the suit
in the record before us.  See Hull v. Davis, 211 S.W.3d 461, 466 (Tex.
App.—Houston [14th Dist.] 2006, no pet.) (holding that appellant failed to
preserve complaint that trial court failed to rule on his motion when no motion
or ruling on any such motion was found in the record).  There is no motion for
dismissal or for summary judgment filed by the Briscoe defendants in the record
before us.  If the Briscoe defendants wished to seek dismissal from the suit,
they must have requested that relief from the trial court first.  See Ctr.
For Neurological Disorders, P.A. v. George, 261 S.W.3d 285, 295 (Tex.
App.—Fort Worth 2008, pet. denied) (refusing to address on appeal grounds for
dismissal that were not raised to the trial court in a motion to dismiss).  It
is not enough that the Briscoe defendants merely pleaded affirmative defenses
that they alleged warranted their dismissal from the case; they were required
to move on those defenses before we may address them on appeal.  See
Tex. R. Civ. P. 166a(b) (requiring defendant seeking summary judgment on the
claims against him to move for summary judgment on those claims).  Because
there is no ruling by the trial court, we overrule the Briscoe defendants’
issue.

Conclusion

Having
sustained Glencrest’s dispositive issue and overruled the Briscoe defendants’
issue, we vacate the trial court’s class certification and remand the case to
the trial court for further proceedings consistent with this opinion.

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
LIVINGSTON,
C.J., MEIER and GABRIEL, JJ.

 

DELIVERED:  August 16, 2012








 









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Civ. Prac.
& Rem. Code Ann. § 51.014(a)(3) (West Supp. 2012).





[3]Ellis did not receive a
letter or a phone call about the bonuses because she was represented by
counsel.  An attorney at Carrington Coleman testified that they sent a letter
to Ellis’s attorney, but Ellis testified that she did not find out that
Glencrest was paying bonuses until about a month before the class certification
hearing held in August 2011.





[4]A “top lease”, Drumm
explained, is “a lease that recognizes it's a subordinate lease and says . . .
it’s a lease subject to the termination of the prior lease.”





[5]The rule is patterned
after Federal Rule of Civil Procedure 23; consequently, federal decisions and
authorities interpreting current federal class action requirements are
persuasive authority.  Sw. Ref. Co. v. Bernal, 22 S.W.3d 425, 433 (Tex.
2000).





[6]Ellis nonsuited all of her
other causes of action against Glencrest, including her fraudulent inducement
claim.





[7]Ellis implies that
Glencrest’s requirement that lessors sign either an extension or a ratification
of their original lease is somehow a breach of the original agreement to pay
the bonus.  However, Ellis does not dispute that all parties who signed the
extension or ratification were paid.  Thus, this issue does not bear on the discussion
of whether a time frame for payment was a term of the agreement.





[8]Ellis’s pleadings and her
motion for class certification state that she was told that she would receive
her bonus within thirty to forty-five days.  See Am. Nat’l Ins. Co.
v. Cannon, 86 S.W.3d 801, 809 (Tex. App.—Beaumont 2002, no pet.) (“The
issues, as broadly worded, include the claims made in plaintiffs’ pleadings.”). 
Ellis’s testimony at the hearing was

Q. Then, to your understanding, was the
agreement and the contract you entered into with Glencrest Resources, LLC, that
if you signed the three-year primary term lease for the $3,000 bonus or pro
rata thereof that within several weeks that you would be paid the bonus
money?

A. That was my understanding. 
[Emphasis added.]

Ellis’s expert Edward F. Sherman
also testified that the contract included “promises that certain things would
be done within a certain period of time,” and that under the terms of the
agreement, payment was due “before the expiration of the lease period.”





[9]The trial court’s order
granting Ellis’s motion for sanctions struck only Glencrest’s “defenses to
class certification,” not their defenses to Ellis’s cause of action.





[10]Ellis testified,

Q. W[ere] there any documents to say what time period
that the bonus on the paper would be paid?

A. Was there anything written?

Q. Yes, ma’am.

A. No, just voiced.

Drumm testified,

Q. Was any published information made available to
lessors that if they showed up at these meetings in the summer of ‘08 that they
would be paid their $3,000 if there was clear title?

A. No.





[11]Ellis’s expert Sherman
argues that the terms of consideration were that Glencrest would pay the
bonus for the execution of a contract, not that Glencrest would pay the bonus
in exchange for the landowner’s oil and mineral rights.  Sherman opined that
this is a simple breach of contract suit based on the agreement by Glencrest to
pay the bonus to anyone who signed a lease, even if they did not own the rights
at that time.  As he testified, “Even as to those individuals, if there are
title issues, they still are entitled to payment of the bonus.”  He claims that
the contract was complete, and the bonus payment due, at the moment the lessor
signed the contract, despite the lack of steps taken to ensure that the lessor
possessed the oil and mineral rights to his land.  Sherman’s interpretation extends
the scope of Glencrest’s responsibility to pay a bonus to include invalid
contracts.  That is, Sherman would have Glencrest pay any lessors who signed a
contract, even if they did so knowing that they did not possess the rights
which they purported to convey to Glencrest.  Sherman also asserted that later
conduct, such as a top lease, would not affect the completed contract and
Glencrest’s obligation to pay.  Even Ellis admits that those lessors who do not
possess clear title to the oil and mineral rights on their land should not be
included in the class.





[12]Sherman testified,

This suit is not for a breach of the lease.  The lease
provides certain responsibilities regarding drilling, for example, that the
defendant is required to carry out.  The suit is not alleging breach for the
drilling responsibilities, for example, or the payments of royalties pursuant
to drilling.  This suit is limited to the agreement to pay a bonus.





[13]Sherman testified that he
reviewed “the pleadings, discovery, and other documents.”  His testimony was
videotaped prior to the hearing, so he did not hear any of the other witnesses’
testimony.  It is also unclear why he believed there were only “six or so” meetings. 
Ellis offered into evidence seven different flyers advertising the meetings. 
Five of those flyers advertised sixteen specific meeting days.  Two flyers
advertised meetings “every Friday” “until further notice,” and another listed
locations for meetings on every weekday without dates.





[14]In fact, Ellis’s own
testimony was not that Briscoe Sr. told the lessors that their bonuses would be
paid within a few weeks.  Instead, Ellis inferred the few-week period from
Briscoe Sr.’s statements that the title check would take a few weeks.  She was
asked,

Q.  Were you told
when you would receive that sign-on bonus money?

 

A.  He mentioned something about the
ones that signed on, their property had to be surveyed for the size of the
property so they would know the amount of bonus to pay and that that would take
several weeks.

And later she was asked,

Q.  Do you remember
some of the questions that were asked during the presentation?

 

A.  The main
question was, “When do we get our bonus money?”

 

Q.  And did you
hear the response?

 

A.  It was, “We
need time to survey your property according to the size to know how much bonus
to pay.”





[15]In its order granting
Ellis’s motions for sanctions, the trial court struck any defenses to class
certification raised by pleadings filed after June 10, 2011.  The Briscoe
defendants filed their amended answer on August 1, 2011.